IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

ISIDORO MARRA,

                    Petitioner,          Civil Action No.
                                         9:14-CV-1171 (GTS/DEP)

        v.

DANIEL MARTUSCELLO, JR.,

                    Respondent.

_____

APPEARANCES:                             OF COUNSEL:

FOR PETITIONER

GIRVIN AND FERLAZZO PC                   DANIEL S.L. RUBIN, ESQ.
20 Corporate Woods Blvd.
Albany, NY 12211

FOR RESPONDENT:

HON. ERIC T. SCHNEIDERMAN               ALYSON J. GILL, ESQ.
New York State Attorney General         Assistant Attorney General
The Capitol
Albany, NY 12224

DAVID E. PEEBLES
CHIEF U.S. MAGISTRATE JUDGE

## REPORT AND RECOMMENDATION

Petitioner Isidoro Marra, a New York State prison inmate as a result

of a 2011 rape conviction, has filed a petition with this court pursuant to 28

U.S.C. § 2254, requesting habeas relief. In support of his petition, Marra

claims that (1) he was denied effective assistance of trial counsel, (2) his conviction was infected by prosecutorial misconduct, and (3) the trial court erred in admitting photographs of the victim's injuries. For the reasons set forth below, I recommend that the petition be denied.

I.     BACKGROUND

On the evening of September 26, 2009, CCR[1] and her boyfriend, Darwin Putnam, went to Villa Isidoro, a combination restaurant and bed and breakfast operated by petitioner and located in Richfield Springs, New York. Dkt. No. 12-1 at 22-25, 97; Dkt. No. 12-2 at 57, 85. The purpose of their visit was to have dinner with Darwin Putnam's mother, Patty Putnam, who was employed at the establishment. Dkt. No. 12-1 at 97; Dkt. No. 12-2 at 85.

The group first consumed drinks in the bar, and later ate dinner together. Dkt. No. 12-1 at 99, 100-101; Dkt. No. 12-2 at 59, 86. While it is uncertain precisely how many alcoholic beverages CRR consumed, witnesses, including Carol Johnston, one of the waitresses, testified that

---

[1]     Under New York law, "[t]he identity of any victim of a sex offense . . . shall be confidential. No . . . court file or other documents, in the custody or possession of any public officer or employee, which identifies such a victim shall be made available for public inspection." N.Y. Civ. Rights Law § 50-b(1). In light of this provision, and in order to insure her privacy, the victim in this case will be referred to herein as "CCR." *Lucidore v. N.Y. State Div. of Parole*, 209 F.3d 107, 109 n.4 (2d Cir. 2000).

she appeared to be intoxicated by the end of the evening. Dkt. No. 12-1 at 36, 55, 71; Dkt. No. 12-2 at 90.

After dinner, CCR laid down and went to sleep on a couch in the reception area of the bed and breakfast.[2] Dkt. No. 12-1 at 70; Dkt. No. 12-2 at 88-89. Johnston returned a few times to check on CCR, and each time found that she was sleeping.[3] Dkt. No. 12-1 at 71-72. Darwin Putnam also checked on CCR on at least two occasions, and each time found her asleep. Dkt. No. 12-2 at 61. After Patty Putnam went upstairs to bed, Darwin Putnam drove CCR's car home, leaving CCR sleeping on the couch with her cell phone on the bar. *Id.* at 61-63.

CCR awakened at some point during the night and found petitioner on top of her, kissing her on the cheek and penetrating her vagina with his penis. Dkt. No. 12-1 at 103-05, 165-66. CCR did not give consent for petitioner to engage in sexual intercourse with her, and she was not awake when the act began. Dkt. No. 12-1 at 126, 168. CCR screamed out for Darwin Putnam and was told by petitioner that he had gone home. Dkt. No. 12-1 at 105. She then got up from the couch, but in doing so lost her

---

[2]    CCR testified a trial that she does not recall lying down on the couch. Dkt. No. 12-1 at 103.

[3]    On one of those occasions Johnston took a photograph of CCR sleeping. Dkt. No. 12-1 at 72.

balance and fell on the edge of the couch, bruising her elbow in the process. *Id.* at 106-07.

After petitioner retrieved CCR's cell phone from the bar and returned it to her, CCR attempted to call Darwin Putnam, her son, and her son's father – all without success. Dkt. No. 112-1 at 108, 123-25. Patty Putnam, who had been sleeping upstairs, was awakened by the commotion and CCR's screaming, and proceeded downstairs to investigate. Dkt. No. 12-1 at 109-10; Dkt. No. 12-2 at 91. CCR told Patty Putnam that petitioner had raped her, and that she wanted Darwin Putnam to take her home. Dkt. No. 12-1 at 110. After explaining to CCR that Darwin took her car home and was planning to return to pick her up the next morning, Patty Putnam offered to drive her to Darwin's house so she could retrieve her car. *Id.*; Dkt. No. 12-2 at 90-93. Patty drove CCR, who left her shoes, credit card, and cash at Villa Isidoro in her haste to leave, and petitioner, who sat in the back seat, to Darwin Putnam's residence in Mohawk, New York. Dkt. No. 12-1 at 110, 116, 149. Patty then left CCR at Darwin's apartment and returned to the bed and breakfast with petitioner. Dkt. No. 12-2 at 93, 96.

Upon arriving at Darwin Putnam's apartment building, CCR ran upstairs, pounded on Darwin's door, and began yelling that petitioner raped her. Dkt. No. 12-1 at 113; Dkt. No. 12-2 at 64-65. Concerned that

CCR might awaken his sleeping sister, Darwin asked CCR to either go downstairs or leave. Dkt. No. 12-1 at 114; Dkt. No. 112-2 at 66.

After leaving Darwin's apartment, CCR again called her son but did not reach him. Dkt. No. 12-1 at 114. CCR then drove to her son's residence, which was in close proximity to Darwin Putnam's apartment, and an ambulance arrived shortly thereafter and transported CCR to the Little Falls Hospital, located in Little Falls, New York.[4] *Id.*; Dkt. No. 12-2 at 82. During the trip, CCR was permitted to urinate in a female urinal available in the ambulance. Dkt. No. 12-2 at 82-83. The paramedic accompanying CCR to the hospital assisted CCR in collecting and saving the urine for future testing. *Id.*

Upon her arrival at the hospital, CCR was examined by Jodi Pollitt, a registered nurse and trained sexual assault nurse examiner. Dkt. No. 12-1 at 186-89. Pollitt described CCR as hysterical, screaming, and crying at the time of her arrival to the hospital. *Id.* at 190, 217. CCR's blood and urine tested negative for the presence of drugs. *Id.* at 209, 226-27. During her examination of CCR, Pollitt prepared two kits, a drug facilitator assault kit and a rape kit, with the expectation that, with the victim's consent, the

---

[4]    It appears that CCR's ex-husband, Ronald Mauro, placed a 911 emergency call on behalf of CCR. Dkt. No. 15-2 at 214.

evidence gathered would be turned over to the New York State Police. Dkt. No. 12-1 at 197.

During the course of her examination, Pollitt took several photographs of CCR's injuries. Dkt. No. 12-1 at 191, 197-209. Those photographs depicted bruising to CCR's elbow and upper arm, right cheek, left shoulder blade, left thigh, left calf, and left lower back, as well as red marks on her upper and lower back. *Id.* at 197-209.

New York State Police Investigator Benjamin Scalise was assigned to investigate CCR's rape complaint. Dkt. No. 12-2 at 123. After receiving the assignment, Investigator Scalise first went to the Little Falls Hospital emergency room and retrieved CCR's clothing, the two evidence kits, and the photographs taken by Pollitt. *Id.* at 124-25. He then went to Villa Isidoro where he took photographs, including of CCR's shoes, credit card, and cash that had been left behind at the restaurant and discovered by Patty Putnam the next morning. *Id.* at 125-30. Petitioner agreed to accompany Investigator Scalise to police barracks in Herkimer, New York, to discuss the events from the prior night. *Id.* at 132-33. Investigator Scalise administered Miranda[5] warnings, and petitioner responded that he

---

[5]     *Miranda v. Arizona*, 384 U.S. 436 (1966).

understood the warnings and agreed to speak with investigators. *Id.* at 135-38.

During the ensuing questioning, petitioner told Investigator Scalise that he had begun drinking on the day in question at 3:00 p.m., and consequently had no recollection of what occurred. Dkt. No. 12-1 at 142. Petitioner also consented to providing a DNA sample, and Investigator Scalise collected a buccal swab from petitioner. *Id.* at 148-51. After making several statements to Investigator Scalise, petitioner invoked his right to counsel. *Id.* at 145. After asking to speak with his attorney, however, petitioner volunteered additional statements to Investigator Scalise, including that "[t]his is [his] own fault for having the restaurant and drinking" and asking "[w]hat if I can prove she came onto me first?" *Id.* at 147.

Cheryl Strevell, a forensic scientist employed at the New York State Police Forensic Investigation Center, received and tested the two evidence kits collected from CCR at the hospital, as well as the buccal swab from petitioner. Dkt. No. 12-2 at 8, 15-18. None of the swabs and smears were found to contain sperm, and only the dried secretions from CCR's mouth and exterior perineum were sufficient for DNA analysis. *Id.* at 20-23. DNA testing was conducted by Alicia Bondi, a forensic scientist

with the New York State Police. Dkt. No. 12-2 at 31-32, 38. Based upon her analysis, Bondi concluded that the secretion from CCR's mouth was consistent with her DNA and at least one additional unidentified male donor. *Id.* at 43-44. Bondi also concluded that the dried secretions from CCR's perineum were consistent with CCR's DNA admixed with petitioner's DNA. *Id.* at 46-48, 51.

During the course of the trial, petitioner did not present any witnesses, nor did he testify in his own defense. Dkt. No. 12-2 at 193.

## II.   PROCEDURAL HISTORY

### A.   State Court Proceedings

On July 16, 2010, a Herkimer County Grand Jury returned an indictment charging petitioner with one count of first degree rape, a Class B felony, in violation of New York Penal Law § 130.35(2). Dkt. No. 12 at 155. A jury trial was convened in Herkimer County Court by County Court Judge Patrick L. Kirk, beginning on March 28, 2011, and concluding on April 5, 2011. Dkt. No. 15-1 at 61; Dkt. No. 15-2 at 549, 587. At the trial, Assistant Herkimer County District Attorney Jeffrey S. Carpenter prosecuted the case, and defendant was represented by George Aney, Esq. *See, e.g. id.* at 549. On April 5, 2011, the jury returned a verdict finding petitioner guilty as charged. Dkt. No. 15-2 at 584. Petitioner was

sentenced on May 5, 2011, to serve eighteen years of imprisonment, to be followed by fifteen years of post-release supervision. Dkt. No. 12-3 at 46.

Petitioner's conviction has been the subject of several prior post-trial proceedings. On June 29, 2011, petitioner filed a motion to vacate the judgment of conviction pursuant to New York Criminal Procedure Law § 440.10, arguing, *inter alia*, that the conviction was the product of ineffective assistance of counsel and prosecutorial misconduct. Dkt. No. 15-3 at 4-12, 63-73. That application was denied by the trial court on August 30, 2011, and leave to appeal was denied by the New York State Supreme Court Appellate Division, Fourth Department, on January 10, 2012. *See, e.g.,* Dkt. No. 15-3 at 60-62.

Petitioner filed a direct appeal from his judgment of conviction with the Fourth Department on December 22, 2011. Dkt. No. 15-4 at 44. The appeal raised several grounds, arguing that (1) the jury's verdict was against the weight of the evidence; (2) the trial court committed error by admitting into evidence irrelevant, inflammatory, and prejudicial photographs; (3) Assistant District Attorney ("ADA") Carpenter committed prosecutorial misconduct during his summation; (4) petitioner received ineffective assistance of counsel from Attorney Aney; and (5) the sentence imposed was unduly harsh and excessive. Dkt. No. 15-4 at 1-40. On June

15, 2012, the Fourth Department issued a decision essentially affirming petitioner's conviction, but modifying the sentence imposed. *People v. Marra*, 96 A.D.3d 1623 (4th Dep't 2012). In its decision, the court first determined that the conviction was not against the weight of the evidence. *Id.* at 1624-25. Addressing petitioner's arguments regarding photographs, the court concluded that the issue was not properly preserved, but, in any event, the prosecution had laid a proper foundation for the admission of the photographs into evidence, and the photographs were relevant and their probative value outweighed any potential for prejudice. *Id.* at 1325-26. The Fourth Department also rejected petitioner's argument regarding prosecutorial misconduct, finding that the issue was not properly preserved, and, in any event, the comments were not so egregious as to deny petitioner a fair trial. *Id.* at 1326. The court further concluded that petitioner was not denied effective assistance of counsel. *Id.* at 1326-27. The court did, however, agree that petitioner's sentence was unduly harsh and excessive, and modified the judgment of conviction by reducing the sentence to a determinate term of imprisonment of ten years, to be followed by five years of post-release supervision. *Id.* at 1327.

Petitioner appealed to the New York Court of Appeals, which also affirmed his conviction. *People v. Marra*, 21 N.Y.3d 979 (2013). In its

decision, the Court of Appeals concluded that petitioner properly preserved his objections concerning the photographs offered by the prosecution, but found the trial court did not abuse its discretion in admitting them into evidence. *Marra*, 21 N.Y.3d at 981. The court also concluded that the alleged shortcomings of petitioner's trial counsel did not amount to ineffective assistance of counsel, commenting that "defendant received meaningful representation." *Id.*

Petitioner filed a second section 440.10 motion to vacate his conviction on July 23, 2013, arguing that new evidence warranted that the conviction be vacated. Dkt. No. 12-3 at 100-112. More specifically, petitioner argued that newly discovered evidence revealed that CCR had a bruise on her leg that pre-existed the rape, and that CCR had admitted to ADA Carpenter that she had slipped on the exterior steps of Villa Isidoro on the night of the incident, after the rape. *Id.* at 105-06. On November 22, 2013, Acting Herkimer County Court Judge John J. Brennan denied petitioner's motion. Dkt. No. 12-3 at 222-31.

B.   Proceedings in This Court

Petitioner commenced this proceeding on September 24, 2014. Dkt. No. 1. In his petition, Marra asserts three grounds for seeking habeas relief, arguing that (1) he received ineffective assistance of counsel at trial;

(2) ADA Carpenter committed prosecutorial misconduct during the course of the trial; and (3) the trial court denied petitioner a fair trial by erroneously receiving into evidence irrelevant and highly prejudicial photographs of the victim. *Id.* at 5, 7-8. On February 24, 2015, respondent Daniel Martuscello, petitioner's custodian at the time the proceeding was commenced, submitted an answer, accompanied by the relevant state court records, all of which have been helpfully paginated and indexed. Dkt. Nos. 11, 12. This matter is now fully briefed and has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(d). *See* Fed. R. Civ. P. 72(b).

III.    DISCUSSION

    A.    Standard of Review

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may grant habeas corpus relief with respect to a claim adjudicated on the merits in a state court only if, based upon the record before the state court, the adjudication of the claim (1) was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) was based on an unreasonable determination of the facts in light of the

evidence presented in the state court proceeding. *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (citing 28 U.S.C. § 2254(d)); *Premo v. Moore*, 562 U.S. 115, 120-21 (2011); *Thibodeau v. Portuondo*, 486 F.3d 61 (2d Cir. 2007) (Sotomayor, J.). The AEDPA "'imposes a highly deferential standard for evaluating state-court rulings' and 'demands that state-court decisions be given the benefit of the doubt.'" *Felkner v. Jackson*, 562 U.S. 594, 598 (2011) (per curiam) (quoting *Renico v. Lett*, 559 U.S. 766, 773 (2010)); *accord, Cullen*, 563 U.S. at 181. Federal habeas courts must presume that the state court's factual findings are correct "unless applicants rebut this presumption with 'clear and convincing evidence.'" *Schriro v. Landrigan*, 550 U.S. 465, 473-74 (2007) (quoting § 2254(e)(1)); *see also Boyette v. Lefevre*, 246 F.3d 76, 88 (2d Cir. 2001). "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable – a substantially higher threshold." *Schriro*, 550 U.S. at 473 (*citing Williams v. Taylor*, 529 U.S. 362, 410 (2000)).

    As required by section 2254, on federal habeas review, a court may only consider claims that have been adjudicated on the merits by the state courts. 28 U.S.C. § 2254(d); *Cullen*, 563 U.S. at 181; *Washington v. Schriver*, 255 F.3d 45, 52-55 (2d Cir. 2001). The Second Circuit has held

that, when a state court adjudicates a claim on the merits, "a federal habeas court must defer in the manner prescribed by 28 U.S.C. § 2254(d)(1) to the state court's decision on the federal claim – even if the state court does not explicitly refer to either the federal claim or to relevant federal case law." *Sellan v. Kuhlman*, 261 F.3d 303, 312 (2d Cir. 2001).

      B.    Exhaustion of Remedies

          1.    Exhaustion

As a preliminary matter, respondent argues that two of petitioner's claims and a portion of his third are unexhausted because they were never fairly presented first to the New York State courts. Dkt. No. 10 at 17-19. Respondent also notes that, with regard to the admissibility of the seven photographs of the victim's injuries, petitioner cited only New York cases before the Fourth Department, but acknowledges that he argued the same claim on federal constitutional grounds before the Court of Appeals. *Id.* at 19.

Prior to seeking federal habeas relief, a petitioner must exhaust available state remedies or establish either an absence of available state remedies or that such remedies cannot adequately protect his rights. *Aparicio v. Artuz*, 269 F.3d 78, 89 (2d Cir. 2001) (quoting 28 U.S.C. § 2254(b)(1)); *Ellman v. Davis*, 42 F.3d 144, 147 (2d Cir. 1994). The

exhaustion doctrine recognizes "respect for our dual judicial system and concern for harmonious relations between the two adjudicatory institutions." *Daye v. Attorney Gen. of N.Y.*, 696 F.2d 186, 191 (2d Cir. 1982); *see also Galdamez v. Keane*, 394 F.3d 68, 72 (2d Cir. 2005) ("Comity concerns lie at the core of the exhaustion requirement."). Though both federal and state courts are charged with securing a state criminal defendant's federal rights, the state courts must initially be given the opportunity to consider and correct any violations of federal law. *Galdamez*, 394 F.3d at 72 (citing *O'Sullivan v. Boerckel*, 526 U.S. 838, 844-45 (1999)). "The chief purposes of the exhaustion doctrine would be frustrated if the federal habeas court were to rule on a claim whose fundamental legal basis was substantially different from that asserted in state court." *Daye*, 696 F.2d at 192 (footnote omitted).

This exhaustion requirement is satisfied if the federal claim has been "'fairly present[ed]'" to the state court. *Dorsey v. Kelly*, 112 F.3d 50, 52 (2d Cir. 1997) (quoting *Picard v. Connor*, 404 U.S. 270, 275 (1971)). A claim has been "fairly presented" if the state court was apprised of "both the factual and the legal premises of the claim [the petitioner] asserts in federal court." *Daye*, 696 F.2d at 191. Thus, "the nature or presentation of

the claim must have been likely to alert the court to the claim's federal nature." *Id.* at 192.

With the foregoing backdrop in mind, I will discuss whether petitioner exhausted each of his claims below.

a.    Ineffective Assistance of Counsel

While respondent concedes that petitioner raised an ineffective assistance of counsel claim at both appellate levels in connection with his direct appeal, he points out that petitioner relied solely upon state law in his appeal to the Fourth Department, and only before the New York Court of Appeals did he cast his ineffective assistance argument in federal constitutional terms. Dkt. No. 10 at 18-19. Respondent argues that petitioner is therefore precluded from now asserting the claim in federal court based on his failure to present the issue in federal constitutional terms to the state courts. *Id.*

It is true that, in his brief to the Fourth Department, petitioner cited only state court cases, including *People v. Baldi*, 54 N.Y.2d 137 (1981), to support his ineffective assistance of counsel claim. Dkt. No. 15-4 at 34-37. In *Baldi*, the New York Court of Appeals noted that "[t]he right to the effective assistance of counsel is guaranteed by the both the Federal and State Constitutions." *Baldi*, 54 N.Y.2d at 146 (citations omitted). The court

16

also noted that "[a] newer, stricter standard," which had been "developed predominantly in the Federal Courts," existed at the time with respect to ineffective assistance of counsel claims. *Id.* Ultimately, however, the Court of Appeals did not adopt the "newer" federal standard, and instead concluded that the standard for effective assistance of counsel in New York is whether "the evidence, the law, and the circumstances of a particular case, viewed in totality and as of the time of the representation, reveal that the attorney provided meaningful representation[.]" *Id.* at 147. In its opinion regarding petitioner's appeal, the Fourth Department echoed the standard enunciated in *Baldi* in its one-sentence analysis of Attorney Aney's representation, concluding that petitioner "received meaningful representation." *People v. Marra*, 96 A.D.3d 1623, 1626-27 (4th Dep't 2012). Accordingly, it appears that plaintiff's ineffective assistance of counsel claim was raised on state-law grounds, and that the Fourth Department decided the claim based upon state law, as well.

In his brief to the Court of Appeals, however, petitioner was explicit in his reliance upon federal law for his ineffective assistance of counsel claim. Indeed, Marra argues that "[he] was denied his right to a fair trial under the constitutions of New York and of the United States by the ineffective assistance of his counsel at trial." Dkt. No. 12 at 133 (emphasis

omitted). While the authorities relied upon in the text of his argument in support of that point are New York State law cases, *id.*, petitioner noted the following in a footnote of his brief to the Court of Appeals:

> Defendant was also denied effective assistance of counsel under the federal constitutional test of Strickland v Washington (466 US 668 [1984]). For descriptions of the respective state and federal tests, see People v Benevento (91 NY2d 708 [1998]) and Baldi (supra).

*Id.* While the Court of Appeals concluded that "defense counsel's alleged failings. . . did not amount to ineffective assistance of counsel, and that defendant received meaningful representation," *People v. Marra*, 21 N.Y.3d 979, 981 (2013), the court did not cite to any authority and otherwise did not discuss the legal standard upon which it relied. *See generally Marra*, 21 N.Y.3d at 981.

As an initial matter, the court must consider the significance, if any, of the fact petitioner did not raise an ineffective assistance of counsel claim on federal constitutional grounds in his appeal to the Fourth Department. The Second Circuit explicitly addressed this circumstance in *Cornell v. Kirkpatrick*, 665 F.3d 369, 376 (2d Cir. 2011). In *Cornell*, the court held that the petitioner's "mere mention of 'ineffective assistance of counsel' in a filing in the Appellate Division" – and considering that he "principally relied" on *Baldi*, which "predates *Strickland v. Washington*,

[466 U.S. 668 (1984)]" – "was insufficient to alert the New York courts to the possible federal basis of that claim."[6] *Cornell*, 665 F.3d at 376. As was discussed above, in this case, petitioner's argument on appeal to the Fourth Department relied strictly on New York case law, including *Baldi*. Dkt. No. 15-4 at 34-37. The standards for evaluating attorney performance under New York State and federal law are distinctly different. *Cornell*, 665 F.3d at 376. Accordingly, "it cannot be convincingly argued that [petitioner] invoked the relevant standards of federal law" on appeal to the Fourth Department. *Id.*

The next issue is whether this defect was cured by petitioner's reference to federal law before the Court of Appeals. Respondent argues that, even if federal law was invoked by petitioner in his brief on appeal to the Court of Appeals, raising the matter for the first time before that court does not satisfy the exhaustion obligation. Dkt. No. 10 at 19. For this proposition, respondent relies on *Castille v. Peoples*, 489 U.S. 346 (1989). In *Castille*, the Court concluded that presentation of a new federal claim to a state's highest court on petition for discretionary review does not

---

[6]     While the court in *Cornell* concluded that the petitioner's ineffective assistance of counsel ground was unexhausted, it nevertheless addressed the merits of the claim because it determined that the respondent had waived his right to argue failure to exhaust by conceding in its briefing that the claim was exhausted. *Cornell*, 665 F.3d at 376-77.

constitute a fair presentation of the issue to the state courts, unless the

state court "has actually passed upon the claim[.]" *Castille*, 489 U.S. at

351; *accord, Lurie v. Wittner*, 228 F.3d 113, 124 (2d Cir. 2000)

("Presenting a claim for the first time to a state court of discretionary

review is insufficient to exhaust the claim unless the court considers it.").

Because the Court of Appeals in this case "actually passed upon"

petitioner's ineffective assistance of counsel claim grounded in federal law,

*Castille* is distinguishable, and I find that claim is exhausted.

### b.   Prosecutorial Misconduct

Respondent argues that petitioner failed to raise his federal claim of

prosecutorial misconduct based upon the introduction of photographs

depicting CCR's injuries to state courts. Dkt. No. 10 at 17-18. He further

contends that the claim of prosecutorial misconduct based on ADA

Carpenter's statements made during his summation, surmising that

petitioner may have been wearing a condom, was not exhausted because,

while it was presented to the Fourth Department, it was not pursued on

appeal to the Court of Appeals. *Id.* at 18.

i.    Photographs

It is clear from a reading of his briefs that petitioner failed to argue to either the Fourth Department or the New York Court of Appeals that the prosecutor committed misconduct by introducing the seven photographs depicting the victim's injuries. Careful review of petitioner's brief to the Fourth Department reveals that, while he complained of the trial court's admission into evidence of the photographs at issue, he did not argue the act of offering those photographs constituted prosecutorial misconduct. Dkt. No. 15-4 at 24-30. The Fourth Department's decision confirms this. In its decision, the court determined that the trial court properly admitted the photographs because "the People laid a proper foundation for the[m], inasmuch as the nurse who took them testified that [they] accurately represented the portions of the victim's body depicted therein." *Marra*, 96 A.D.3d at 1625-26. Likewise, petitioner argued on appeal to the Court of Appeals that the trial court erred in admitting the photographs, Dkt. No. 12 at 122-32, and the Court of Appeals rejected his argument. *See Marra*, 21 N.Y.3d at 387-88 ("We cannot say the trial judge abused his discretion by allowing the photographs into evidence[.]"). Because it is clear from the record in this case that petitioner's focus before the state appeals courts was upon the trial court's conduct in admitting the photographs, and not

upon the prosecution's actions in offering them into evidence, this portion of petitioner's prosecutorial misconduct claim is unexhausted for purposes of his request for a writ of habeas corpus.

ii.    Summation

It is clear that petitioner did raise before the Fourth Department the question of prosecutorial misconduct in connection with ADA Carpenter's statements during summation regarding whether petitioner wore a condom during commission of the crime. Dkt. No. 15-4 at 31-33. Indeed, that argument was specifically addressed by the Fourth Department in its decision, and was rejected both upon procedural grounds and on the merits. *Marra*, 96 A.D.3d at 1626. Petitioner did not raise the argument, however, on appeal to the Court of Appeals. Dkt. No. 12 at 97-143. Nor was the issue addressed in that court's decision. *Marra*, 21 N.Y.3d 979-81. Consequently, the issue was not presented to the highest court in New York State, and is therefore unexhausted. *See, e.g., Grey v. Hoke*, 933 F.2d 117, 120 (2d Cir. 1991) ("The fair import of petitioner's submission to the Court of Appeals, consisting of his brief to the Appellate Division that raised three claims and a letter to the Court of Appeals arguing only one of them, was that the other two had been abandoned. The only possible indication that the other two claims were being pressed was the inclusion

of a lengthy brief originally submitted to another court. This did not fairly apprise the court of the two claims."); *Manzella v. Senkowski*, No. 97-CV-0921, 2004 WL 1498195, at *13 (W.D.N.Y. July 2, 2004) ("In this case, [the petitioner]'s appellate counsel raised five specific claims to the Court of Appeals but did no[t] raise the weight of the evidence claim. Therefore, [the petitioner] has failed to fairly present this claim to the highest state court for purposes of meeting his exhaustion requirement.").

### c.    Admission of Photographs at Trial

In his brief to the Fourth Department, petitioner relied solely upon state law when arguing that the trial court improperly admitted the photographs of CCR's injuries into evidence. Dkt. No. 15-4 at 24-30. The Fourth Department similarly rested its decision upon state law in concluding that a proper foundation was laid for admission of the photographs, and that they were relevant. *Marra*, 96 A.D.3d at 1625-26. In his brief to the Court of Appeals, however, petitioner relied upon both state and federal law in arguing that the trial court erred in admitting the photographs. Dkt. No. 12 at 122-32. Accordingly, for the same reasons discussed above in part III.B.1.a. with respect to petitioner's ineffective assistance of counsel claim, I recommend a finding that this claim is exhausted.

2.    Procedural Default

Because I have determined that petitioner's prosecutorial misconduct claims are unexhausted, I must next consider whether those claims are procedurally defaulted. In the event an unexhausted claim is "barred by state law and. . . its presentation in the state forum would [therefore] be futile[,] . . . [the federal habeas court] theoretically has the power to deem the claim exhausted." *Aparicio*, 269 F.3d at 90. As the Second Circuit candidly noted, however,

> This apparent salve. . . proves to be cold comfort to most petitioners because . . . when 'the petitioner failed to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred, federal habeas courts also must deem the claims procedurally defaulted.'

*Id.* (quoting *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991)). Once a claim has been deemed procedurally defaulted, it is subject to dismissal unless the petitioner can demonstrate "cause for the default and prejudice, or that failure to consider the claim will result in a miscarriage of justice (i.e., the petitioner is actually innocent)." *Aparacio*, 269 F.3d at 90 (citing *Coleman*, 501 U.S. at 748-50); *Fama v. Comm'r of Corr. Servs.*, 235 F.3d 804, 809 (2d Cir. 2000).

To establish cause sufficient to excuse a procedural default, a petitioner must show that "some objective factor external to the defense impeded [his] efforts to comply with the State's procedural rule." *Coleman*, 501 U.S. at 753; *accord, Maples v. Thomas*, 565 U.S. 266, 281 (2012). When a petitioner has failed to establish adequate cause for his procedural default, the court need not examine the issue of prejudice because federal habeas relief is generally unavailable as to procedurally defaulted claims unless both cause and prejudice are demonstrated. *Murray v. Carrier*, 477 U.S. 478, 496 (1986); *Stepney v. Lopes*, 760 F.2d 40, 45 (2d Cir. 1985).

In this case, petitioner has procedurally defaulted on his prosecutorial misconduct claims. He cannot now file an appeal with the Fourth Department in order to advance those unexhausted claims because, according to New York law, a defendant is "entitled to one (and only one) appeal to the Appellate Division." *Aparicio*, 269 F.3d at 91. Moreover, because "New York does not otherwise permit collateral attacks on a conviction when the defendant unjustifiably failed to raise the issue on direct appeal," petitioner cannot now properly raise any unexhausted claims, which are all based upon the record, in a motion pursuant to Article 440 of the New York Criminal Procedure Law. *Id.* (citing CPL §

440.10(2)(c)); *Bossett v. Walker*, 41 F.3d 825, 829 (2d Cir. 1994). Any unexhausted claims are therefore "deemed exhausted for purposes of [petitioner's] habeas application" but also procedurally defaulted. *Spence v. Superintendent, Great Meadow Corr. Fac.*, 219 F.3d 162, 170 (2d Cir. 2000); *accord, Rush v. Lempke*, 500 F. App'x 12, 15 (2d Cir. 2012).

In order to address the merits of petitioner's prosecutorial claims, the court must find that petitioner has demonstrated cause and prejudice for his procedural default, and/or that petitioner is actually innocent. In this case, however, petitioner has failed to demonstrate cause for failing to raise his prosecutorial misconduct claims in federal constitutional terms in state court or prejudice resulting therefrom. Indeed, petitioner does not address that prong of the analysis, and instead maintains that he "fairly present[ed]" the prosecutorial misconduct claims to the state courts. Dkt. No. 18 at 3-6.

Petitioner does, however, contend that he is actually innocent, and, therefore, his procedurally defaulted prosecutorial misconduct claims should nevertheless be considered on the merits. Dkt. No. 18 at 7-12. In the "extremely rare" case, "a petitioner may use his claim of actual innocence as a 'gateway,' or a means of excusing his procedural default, that enables him to obtain review of his constitutional challenges to his

conviction." *Doe v. Menefee*, 391 F.3d 147, 161 (2d Cir. 2004) (quoting *Schlup v. Delo*, 513 U.S. 298, 315 (1995)); *see also Rivas v. Fischer*, 687 F.3d 514, 540 (2d Cir. 2012) ("[I]n rare cases, an assertion of innocence may allow a petitioner to have his *accompanying* constitutional claims heard despite a procedural bar." (emphasis in original). As the Second Circuit has explained, a petitioner asserting actual innocence "does not seek to have his conviction vacated on grounds of innocence; rather, he seeks to create sufficient doubt about his guilt that the habeas court will permit him to pursue his accompanying constitutional claims notwithstanding an otherwise applicable procedural bar." *Rivas*, 687 F.3d at 541.

Claims of actual innocence must be both credible and compelling. *Rivas*, 687 F.3d at 541 (citing *House v. Bell*, 547 U.S. 518, 521 (2006)). To be credible, a petitioner's claim "must be supported by 'new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial.'" *Rivas*, 687 F.3d at 541 (quoting *Schlup*, 513 U.S. at 324). An actual innocence claim is compelling whether the petitioner demonstrates that "more likely than not, in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt—or to

remove the double negative, that more likely than not any reasonable juror would have reasonable doubt." *House*, 547 U.S. at 538; *accord, Rivas*, 687 F.3d at 541. In the end, "the *Schlup* [gateway] standard is demanding and permits review only in the extraordinary case," but it "does not require absolute certainty about the petitioner's guilt or innocence." *Rivas*, 687 F.3d at 543 (quotation marks omitted).

Here, the new evidence upon which petitioner relies is not so compelling as to lead the court to conclude that reasonable jurors would have reasonable doubt as to petitioner's guilt. Petitioner points to a letter disclosed by ADA Carpenter seven days prior to oral argument in the Court of Appeals. Dkt. No. 18 at 8-9. According to petitioner, the letter disclosed as follows:

> While preparing for oral argument and discussing the case with the alleged victim, 'the victim indicated to [ADA Carpenter] that she recalls that she had slipped on a set of exterior stairs at the Villa Isidoro on September 26, 2009 [sic] when she went outside following the rape' and that [ADA Carpenter] 'asked [the victim] if that is how she believes she sustained the marks to her back and she responded she had no idea. She did not state that this was the cause of the marks which appear in some of the photographic exhibits nor that she had sustained any type of injury as a result thereof. The victim consistently maintained having no knowledge as to the cause of any of the injuries depicted in the photographs and the People did not possess this information while trial was being conducted.'

*Id.* at 8-9 (alterations omitted). Generally, petitioner argues that the foregoing information revealed by the victim would have further diminished her credibility at trial, upon which the case largely hinged. *Id.* at 9-10. The victim's inability to state with certainty whether she sustained the injuries indicated in the photographic evidence admitted at trial during the fall down the stairs at Villa Isidoro does not create any more doubt as to petitioner's guilt than the evidence submitted during the trial. With respect to the photographs admitted at trial, Jodi Pollitt, the nurse that examined CCR and took the photographs upon her arrival at the hospital, admitted at trial that she did not know how the victim sustained her injuries. Dkt. No. 15-2 at 57. In addition, the victim did not testifiy at trial with respect to any injury she sustained during the rape, nor did she testify in any regard concerning the photographs. Accordingly, although the admission of the photographs at trial could have suggested to the jury that the victim sustained them as a result of the alleged rape, there was already evidence upon which the jury could have relied to determine that the victim's injuries were not caused by petitioner.

The second piece of new evidence upon which petitioner relies in support of his actual innocence claim is an affidavit from the victim's ex-husband, Ronald Mauro. Dkt. No. 18 at 10-11. In this affidavit, Mauro

purportedly swears that the victim told him, on the night of the alleged

rape, that petitioner did not wear a condom during the commission of the

crime. *Id.* at 10. In addition, Mauro also states that the victim caused

bodily injury to herself after the alleged rape but before she was

photographed at the hospital. *Id.* According to petitioner, this evidence

further undermines the victim's credibility and "provides alternative non-

violent and equally plausible explanations for the bruises and red marks

depicted in the photos" of the victim. *Id.* at 11. Setting aside the issue of

Mauro's reliability and the fact that new evidence submitted in support of a

gateway actual innocence claim must be "credible," *Schlup*, 513 U.S. at

324, the information contained in the affidavit is not compelling in light of

all of the evidence submitted at trial. Addressing petitioner's arguments in

reverse order, as was just discussed above, the source of the victim's

injuries was already called into doubt at trial with the testimony of both the

victim and the nurse who took the photographs. Dkt. No. 15-2 at 57. Pollitt

could not testify how CCR sustained the injuries, *id.*, and CCR did not

testify at all concerning the injuries depicted in the photographs. Thus, the

additional evidence proffered by way of Mauro's affidavit is nothing more

than cumulative insofar as it casts doubt as to how the injuries occurred.

With respect to the victim's alleged "confess[ion]" that petitioner did not

wear a condom during the commission of the crime, such evidence does not lead to the conclusion that the jury would have used the statement to find reasonable doubt as to petitioner's guilt in light of all of the evidence adduced at trial. Indeed, the victim's credibility was already called into question during her cross examination, and the DNA testing that suggested petitioner did not penetrate the victim's vagina further undermined the victim's testimony that she woke up with petitioner on top of her and with his penis inside her vagina. The victim's alleged statement that petitioner did not wear a condom, as reported by Mauro, is not decisive with respect to the victim's credibility in light of all of the evidence adduced at trial aimed at undermining her testimony. In short, the victim's statement to Mauro regarding whether petitioner wore a condom does not lead me to conclude that a jury would have found reasonable doubt as to petitioner's guilt had it been presented with the evidence.

Because I do not find the new evidence proffered by petitioner to be compelling, I conclude that he has not satisfied the *Schlup* gateway standard for actual innocence, and therefore find no reason to address the merits of petitioner's prosecutorial misconduct claims on the merits in light

of petitioner's procedural default.[7]

### C.     Merits of Petitioner's Remaining Claims

#### 1.     Admission of Photographs at Trial

Petitioner contends that the trial court erred in admitting the photographs of CCR's injuries at trial because the prejudicial effect of them "far outweighed their probative value[.]" Dkt. No. 1-1 at 34. Indeed, petitioner argues that because "physical violence was not a component of Rape in the First Degree," the photographs were irrelevant. *Id.* at 33.

#### a.     Clearly Established Supreme Court Precedent

Only when a petitioner can prove that a trial court's error in admitting or excluding certain evidence deprived him of a fundamentally fair trial does such error rise to the level of constitutional violation. *See Collins v. Scully*, 755 F.2d 16, 18 (2d Cir. 1985) ("In order to prevail on a claim that an evidentiary error deprived the defendant of due process under the Fourteenth Amendment he must show that the error was so pervasive as to have denied him a fundamentally fair trial."); *see also Estelle v.*

---

[7]     Petitioner has requested that the court hold an evidentiary hearing to further examine the newly proffered evidence in the event the court "is not convinced that the [evidence is] sufficient to undermine the legitimacy of Petitioner's conviction." Dkt. No. 18 at 11. Notwithstanding whether a hearing is even permitted under *Cullen v. Pinholster*, 563 U.S. 170 (2011), I recommend that the court decline petitioner's request because the evidence does nothing more than further undermine the credibility of the victim, which, as discussed above, was already at issue and called into question during trial.

*McGuire*, 502 U.S. 62, 72 (1991) (concluding that the ultimate question on federal habeas review is not necessarily whether the trial court erred under state law but whether the error "so infected the entire trial that the resulting conviction violates due process" (quotation marks omitted)). In particular, the question in this case is "whether the erroneously admitted evidence, viewed objectively in light of the entire record before the jury, was sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it." *Collins*, 755 F.2d at 19.

A court faced with a claim that the trial court erroneously admitted certain evidence at trial to the detriment of a petitioner's due process rights must engage in a two-part analysis, examining (1) whether the trial court's evidentiary ruling was in error under New York State law, and (2) whether that error denied petitioner of a fundamentally fair trial. *See Wade v. Mantello*, 333 F.3d 51, 59 & n.7 (2d Cir. 2003) (acknowledging that, before a court analyzes whether an evidentiary ruling constitutes a constitutional error, it must first determine that the ruling was erroneous).

In New York, photographs "should not be admitted unless they tend to prove or disprove some material fact in issue." *People v. Stevens*, 76 N.Y.2d 833, 835 (1990) (citation omitted); *see also People v. Pobliner*, 32

33

N.Y.2d 356, 370 (1973). Once "relevance is demonstrated, the question as to whether . . . the jury should be permitted to view such photographs is addressed to the sound discretion of the trial court." *Stevens*, 76 N.Y.2d at 835. Where the photographs serve only to "severely prejudice the defendant," however, it is an error to admit them at trial. *People v. Mercado*, 120 A.D.2d 619, 620 (1986); *see also Pobliner*, 32 N.Y.2d at 370 ("Photographic evidence should be excluded only if its sole purpose is to arouse the emotions of the jury and to prejudice the defendant." (citations omitted)).

b.    <u>State Courts' Decisions</u>

In its decision addressing petitioner's appeal, the Fourth Department wrote three paragraphs in response to petitioner's contention that the trial court erred in admitting the photographs. *Marra*, 96 A.D.3d at 1625-26. Examining the matter from an evidentiary standpoint, the court concluded that the prosecution laid a proper foundation for admission of the photographs into evidence, and that they were relevant. *Id.* In its decision affirming the conviction, the Court of Appeals concluded, in relevant part, that the trial judge did not abuse his discretion in admitting the photographs into evidence. *Marra*, 21 N.Y.3d at 981.

c.    <u>Contrary to or Unreasonable Application of Clearly
Established Supreme Court Precedent</u>

Mindful of the deference owed to the state courts' decisions, and having carefully reviewed both the photographs and the trial transcript in this matter, I conclude the state courts did not err in determining the photographs were properly admitted at trial. Despite petitioner's pleas to the contrary, the photographs were relevant not only to the issue of the victim's helplessness, but also to the prosecution's theory that, by undressing CCR and having sexual intercourse with her while she was sleeping, defendant caused bruising and red marks to CCR's body that is inconsistent with consensual intercourse. In addition, Jodi Pollitt, the emergency room nurse who treated CCR upon arriving at the hospital and took the photographs, testified at trial that the injuries appeared to be fresh. As both the Fourth Department and Court of Appeals concluded, in light of the photographs' relevance to the prosecution's case, the trial judge did not abuse his discretion in admitting them. Because the admission of the photographs was not erroneous, petitioner was not deprived of a fundamentally fair trial in violation of his due process rights. Accordingly, I recommend that this ground of Marra's petition be rejected.

2.      Ineffective Assistance of Counsel

Petitioner contends that George Aney, Esq., his counsel at trial, was

ineffective in representing him because he

> (1) . . . foolishly pursued a defense theory based on
> his erroneous belief that the victim had to be
> unconscious, rather than merely drunk or sleeping,
> in order to be 'helpless' under New York's first
> degree rape statutep [sic] at the expense of other
> available and more suitable defenses; (2) failed to
> interview or call as a witness Ronald Mauro; (3)
> made comments about his own age and memory
> that disparaged Petitioner's defense; (4) . . .
> discredited and then failed to raise pertinent parts of
> testimony given by Mrs. Putnam, and [sic]
> eyewitnesses to events which occurred directly after
> the alleged rape, during his summation; (5) failed to
> counter the prosecutions [sic] proffer of improper
> photographic evidence; and, (6) failed to object to
> the prosecutor's summation when he made
> improper statements regarding Petitioner's alleged
> use of a condom.

Dkt. No. 1 at 5. As was stated above, both the Fourth Department and the

Court of Appeals rejected Marra's ineffective assistance of counsel

argument, concluding that he received meaningful representation at trial.

a.      Clearly Established Supreme Court Precedent

Under the well-established standard governing constitutional

ineffective assistance of counsel claims,

> the defendant must show that counsel's
> performance was deficient. This requires showing
> that counsel made errors so serious that counsel

was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland v. Wash.*, 466 U.S. 668, 687 (1984); *accord, Waiters v. Lee*, No. 15-PR-3487, 2017 WL 2218715, at *8 (2d Cir. May 22, 2017). To be constitutionally deficient, the attorney's conduct must fall "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690; *accord, Rivas*, 780 F.3d at 547. An attorney's performance is judged against this standard in light of the totality of the circumstances and from the perspective of counsel at the time of trial, with every effort made to "eliminate the distorting effects of hindsight[.]" *Strickland*, 466 U.S. at 689; *see also Rivas*, 780 F.3d at 547 (noting the court's "scrutiny of counsel's performance must be 'highly deferential'" (quoting *Strickland*, 466 U.S. at 689)).

Addressing the second prong of the *Strickland* test, courts have generally held that prejudice is established by showing that there is a "reasonable probability" that, but for the attorney's deficient conduct, "the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694; *Murden v. Artuz*, 497 F.3d 178, 198 (2d Cir. 2007) ("Under *Strickland,*

a defendant must show that . . . there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (quotation marks omitted)); *accord, Waiters*, 2017 WL 2218715, at *10.

> b.   State Courts' Decisions

The decisions of the Fourth Department and the Court of Appeals, insofar as they address petitioner's ineffective assistance claim, are not enlightening. In its opinion, the Fourth Department rejected the argument, succinctly stating the following:

> We reject defendant's further contention that he was denied effective assistance of counsel. The purported shortcomings of defense counsel did not demonstrate actual ineffectiveness and, viewing defense counsel's representation in totality and as of the time of the representation, we conclude that defendant received meaningful representation.

*Marra*, 96 A.D.3d at 1626-27 (citation omitted). The portion of the Court of Appeals' decision addressing the ineffective assistance claim is even more terse:

> Finally, we conclude that defense counsel's alleged failings, such as his neglect to the object to the prosecutor's comment in summation about condom use, did not amount to ineffective assistance of counsel, and that defendant received meaningful representation.

*Marra*, 21 N.Y.3d at 981.

As can be seen, the decisions on this issue from both of the state appellate courts are devoid of any extensive discussion addressing the underpinnings of petitioner's ineffective assistance of counsel argument. It is therefore difficult to discern the reasoning of those courts and determine whether the collective rejection of the claim is either contrary to or an unreasonable application of clearly established Supreme Court law. When a state appellate court fails to state its reasoning for rejecting a claim, a federal court being asked to grant habeas relief must identify any arguments or theories that might have supported the state courts' decisions and then determine "whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme Court]." *Harrington v. Richter*, 562 U.S. 86, 102 (2011); *accord, Jackson v. Conway*, 763 F.3d 115, 147 (2d Cir. 2014); *see also Waiters*, 2017 WL 2218715, at *9.

        c.      <u>Contrary to or Unreasonable Application of Clearly Established Supreme Court Precedent</u>

Although petitioner asserts that Attorney Aney's representation was laced with other deficiencies, according to petitioner, the most fatal flaw in Aney's representation was the pursuit of a meritless theory to the effect that, for purposes of the penal statute under which petitioner was charged, a distinction could be drawn between a victim being unconscious as a

result of alcohol, drugs, or for some other similar reason, and merely sleeping. Dkt. No. 1-1 at 15-20. According to petitioner, Attorney Aney's hypothesis, which was rejected by the jury, was fatally flawed. *Id.*

The law under which petitioner was indicted provides, in relevant part, that "[a] person is guilty of rape in the first degree when he . . . engages in sexual intercourse with another person. . . [w]ho is incapable of consent by reason of being physically helpless[.]" N.Y. Penal Law § 130.35. The term "physically helpless" is defined by statute to mean "that a person is unconscious or for any other reason is physically unable to communicate unwillingness to an act." N.Y. Penal Law § 130.00(7). That definition is broad enough to encompass, within its purview, a person who is asleep. *See, e.g., People v. Greene*, 13 A.D.3d 991, 992 (3d Dep't 2004) (finding that the testimony of the victim "established that she was asleep when defendant penetrated and began raping her, which is sufficient to prove physical helplessness under the statute" (citations omitted)); *see also People v. Krzykowski*, 293 A.D.2d 877, 879 (3d Dep't 2002); *People v. Sensourichanh*, 298 A.D.2d 886, 886 (3d Dep't 2002); *accord, Dunham v. Travis*, 313 F.3d 724, 731 (2d Cir. 2002).

According to petitioner, Attorney Aney insisted that CCR was not physically helpless because she was merely asleep – a position that

draws support from the record. In his closing, Aney explained to the jury

that "one of the elements that you're going to have to discuss when you

get in that jury room, is whether or not, two things, [CCR] was conscious

or ever unconscious, and whether or not she was ever physically

helpless." Dkt. No. 12-2 at 202. Shortly after making that statement,

counsel argued the following:

> I can submit to you that you might want to
> determine whether or not this woman was drunk or
> impaired or intoxicated to the point where the
> People say she was unconscious.
>
> And ladies and gentlemen, I do make a
> differentiation between sleeping and being
> unconscious.

*Id.* at 206. Aney persisted in drawing a distinction between being

unconscious and merely sleeping throughout the balance of his closing

argument. *See e.g. id.* at 209 ("Here we know there's a claim that she was

unconscious, and I presume that there's going to be some kind of a

translation or some kind a suggestion that while she was sleeping on the

couch in the entryway, that constitute unconsciousness. That constituted

sleepiness and nothing more."), 210,  212 ("Well, does [CCR] expect you

as finders of fact in one of the most serious of crimes alleged that we know

in New York State, that you're going to assume that sleeping is the same

thing as being unconscious . . . ?"). Near the end of his summation

41

Attorney Aney attempted to further develop this theory by suggesting that the first-degree rape statute was designed "to protect truly helpless people, those in nursing homes, those in hospitals, those in stretchers that we read every day are violated by workers, not the likes of this situation." Dkt. No. 12-3 at 8.

It is clear, based on Attorney Aney's closing, that he believed petitioner could escape conviction if the jury simply found CCR to have been sleeping on the night of the incident. Aney explicitly drew a distinction between unconsciousness and sleeping for purposes of the rape statute under which petitioner was charged, and in no uncertain terms argued to the jury that CCR was asleep and not unconscious. In light of New York State's clear precedent that includes sleeping in its definition of "physically helpless" under New York Penal Law § 130.35, I recommend the court find that Aney's insistence that CCR was asleep during the commission of the crime falls "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690.

In recommending this conclusion I have carefully reviewed the trial transcript in its entirety, bearing in mind that the court's scrutiny of counsel "must be highly deferential" *Rivas*, 780 F.3d at 547 (quotation marks omitted), and that this court's role on habeas review of a state court's

*Strickland* ruling is to determine not whether "the state court's determination was incorrect, but rather whether that determination was objectively unreasonable—a substantially higher threshold." *Waiters*, 2017 WL 2218715, at *9 (quotation marks and alterations omitted). Based upon that review, I have been unable to conceive of an alternative explanation for Aney's closing remarks that does not reflect his misguided belief that the jury would be unable to convict petitioner if they concluded CCR was sleeping. Given the number of comments made by counsel regarding whether CCR was sleeping, and the explicit language he used drawing a distinction between sleeping and unconsciousness, only one conclusion seems possible: Aney believed sleeping did not constitute physically helpless under New York Penal Law § 130.35. The law in New York is clear with respect to this issue, however, and I recommend the court find that Aney's misunderstanding of the law amounts to constitutionally deficient representation. *See Waiters*, 2017 WL 2281715, at *9 ("Accordingly, to justify relief, [the petitioner] was required to establish that the state court's ruling was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." (quotation marks and ellipsis omitted)).

This does not end the inquiry, however, concerning whether Aney provided ineffective assistance of counsel. I must next consider whether petitioner has demonstrated that he was prejudiced as a result of Attorney Aney's deficient representation. *See, e.g., Strickland*, 466 U.S. at 668; *Waiters*, 2017 WL 2218715, at *8. In order to satisfy this prong of the claim, petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Waiters*, 2017 WL 2218715, at *10 (quotation marks omitted). The Second Circuit has recently reiterated that "the chance of an alternate result must be substantial, not just conceivable," and that, "where a conviction is supported by overwhelming evidence of guilt, habeas relief on the ground of ineffective assistance is generally not warranted." *Id.* (quotation marks omitted).

In this case, the specific question the court must address is whether, absent Aney's effective admission that CCR was sleeping (and, therefore, physically helpless under New York Penal Law § 130.35), there was sufficient evidence adduced at trial from which the jury could have found that CCR was physically helpless. Based on my review of the trial transcript, I find that there was testimony from several witnesses regarding whether CCR was intoxicated, unconscious, and/or sleeping at the time

petitioner allegedly raped her. Because some witnesses during the trial suggested that CCR was sleeping (as opposed to unconscious or intoxicated), I recommend the court conclude that Aney's closing remarks wherein he insisted that CCR was sleeping were not so serious as to constitute prejudice under the *Strickland* standard.

Turning to the specific testimony adduced at trial bearing upon his issue, I note that the bartender at Villa Isidoro, Kevin Bolton, testified that he served CCR six drinks but that she drank, at most, four of them. Dkt. No. 15-1 at 371, 389, 391. He believed CCR to have been "pretty intoxicated" by the time she went to lay down on the couch, and he described her as "pass[ing] out" on the couch. *Id.* at 374, 375, 386, 394. Carol Johnston, the waitress serving petitioner and CCR the night of the incident, also testified at trial that CCR appeared intoxicated by the time CCR laid down. *Id.* at 410. Unlike Bolton, however, Johnston believed that CCR had only consumed a "couple" glasses of wine during the course of the whole evening and described CCR as "sleeping" on the couch approximately twenty minutes after she laid down. *Id.* at 417, 422, 424.

During her testimony, CCR insisted that she drank two and one-half glasses of wine, at most, during the evening. Dkt. No. 15-1 at 440, 474, 476-77, 501. She testified that she did not know whether she felt

intoxicated during dinner, but she knew that she felt sick to her stomach. *Id.* at 441-42, 480. Later at the hospital, however, CCR apparently told the attending nurse, Jodi Pollitt, that she felt more intoxicated than she would have expected and that she became unconscious for a period of time while on the couch.[8] Dkt. No. 15-2 at 37, 38, 86. CCR admitted during her testimony at trial that the testing of her urine showed that she had not been drugged. Dkt. No. 15-1 at 459. When asked if she was "awake" when petitioner was having sexual intercourse with her, she answered, "No." *Id.* at 565, 507.

Darwin Putnam testified at trial that he knew CCR consumed at least two glasses of wine on the night of the incident but that he otherwise did not monitor her consumption closely. Dkt. No. 15-2 at 157. He did not believe CCR was intoxicated, and he described her as sleeping and snoring on the couch when he checked on her. *Id.* at 159, 161, 170. Although Patty Putnam similarly characterized CCR as sleeping on the couch when she went upstairs to retire, she suggested that CCR showed signs of intoxication prior to leaving the dinner table. *Id.* at 188, 189.

All of the above-described testimony reflects that the jury had sufficient evidence upon which to rely to conclude that CCR was physically

---

8       When CCR spoke with Investigator Scalise, she told him that she was not drunk. Dkt. No. 15-2 at 288.

helpless, for purposes of New York Penal Law § 130.35, at the time of the incident. While the testimony did not conclusively establish that CCR was intoxicated, the jurors had ample testimony on which they could rely to determine that CCR was intoxicated, unconscious, or sleeping during the commission of the crime. Any of those circumstances would have been sufficient to find that CCR was physically helpless. Indeed, aside from Attorney Aney's closing remarks emphasizing that CCR was asleep (which, of course did not constitute admissible evidence), there was independent witness testimony, including from the victim herself, that CCR was asleep during the time petitioner had sexual intercourse with her. Because the trial transcript reflects that the jurors were presented with an abundance of evidence upon which they could have relied in determining that CCR was physically helpless under New York Penal Law § 130.35, including that she was sleeping during the commission of the crime, I find that Aney's deficient representation – by way of his closing statement wherein he insisted that CCR was sleeping and inferred that sleeping does not constitute physically helpless – was not prejudicial to petitioner, and did not deprive him of a fair trial. Accordingly, I recommend the court find that petitioner was not deprived of effective assistance of counsel.[9]

---

[9]     I have considered the remaining grounds upon which petitioner asserts his

D.    Certificate of Appealability

To appeal a final order denying a request by a state prisoner for habeas relief, a petitioner must obtain from the court a certificate of appealability ("COA"). 28 U.S.C. § 2253(c)(1)(A); *see also* Fed. R. App. P. 22(b)(1) ("[T]he applicant cannot take an appeal unless a circuit justice or a circuit or district judge issues a certificate of appealability under 28 U.S.C. § 2253(c)."). In the absence of a COA, a federal court of appeals lacks jurisdiction to entertain an appeal from the denial of a habeas petition. *Hoffler v. Bezio*, 726 F.3d 144, 152 (2d Cir. 2013). A COA may issue only "if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *Hoffler*, 726 F.3d at 154. A petitioner may demonstrate a "substantial showing" if "the issues are debatable among jurists of reason; . . . a court could resolve the issues in a different manner; or . . . the questions are adequate to deserve encouragement to proceed further."[10] *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4 (1983) (quotation marks omitted).

---

ineffective assistance of counsel claim and find that Attorney Aney's representation in those respects neither constitute constitutionally deficient representation nor prejudiced petitioner.

[10]    A similar standard applies when a COA is sought to challenge the denial of a habeas petition on a procedural basis. *See Slack v. McDaniel*, 529 U.S. 473, 478 (2000) ("[A] COA should issue . . . if the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a

In this instance, I conclude that the petitioner has made a substantial showing of the denial of a constitutional right with respect to his ineffective assistance of counsel claim, and therefore recommend that a COA be issued to permit petitioner to appeal to the Court of Appeals for the Second Circuit, limited to the pursuit of his claim of ineffective assistance of counsel.

IV.    <u>SUMMARY AND RECOMMENDATION</u>

Having carefully reviewed the record in this case in light of petitioner's arguments, and having concluded that some of his grounds for habeas relief are procedurally foreclosed and the remaining claims lack merit, it is therefore hereby respectfully

RECOMMENDED that the petition in this matter be DENIED and DISMISSED in all respects; and it is further hereby respectfully

RECOMMENDED that, based upon my finding that petitioner has made a "substantial showing of the denial of a constitutional right" pursuant to 28 U.S.C. § 2252(c)(2), a certificate of appealability be issued with respect to the ineffective assistance of counsel claim set forth in his petition.

---

constitutional right, and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.").

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report.[11] FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

Dated:    May 25, 2017
          Syracuse, New York

David E. Peebles
U.S. Magistrate Judge

---

[11]    If you are proceeding *pro se* and are served with this report and recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the report and recommendation was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).